IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. CHARLES CAREY BLAIR, | ) ) ) | |
| Petitioner, | ) ) | No. 11 CV 4108 |
| v. | ) ) | Judge Robert W. Gettleman |
| DAVE REDNOUR, Warden, Menard Correctional Center, | ) ) ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Pro se petitioner Charles Carey Blair[1] has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons discussed below, the habeas petition is denied, and the court declines to issue a certificate of appealability.

## BACKGROUND

After a jury trial, petitioner was convicted of the first-degree murder of his wife, Teresa Blair. He was sentenced to 38 years' imprisonment.

As described by the Illinois Appellate Court on direct review, Rule 23 Order, People v. Blair, No. 2-03-0101 (Ill. App. Ct. Aug. 6, 2004), the State's evidence at trial showed that in January 2001, petitioner traveled with his wife from their home in Missouri to Vernon Hills, Illinois, so petitioner could attend a training seminar. While in Vernon Hills, petitioner and his

---

[1] Petitioner named the People of Illinois as respondent. The court substitutes as respondent Dave Rednour, the warden of Menard Correctional Center, petitioner's parent institution. Petitioner is currently incarcerated at the Ellsworth Correctional Facility in Kansas in accordance with the Interstate Corrections Compact, 730 ILCS 5/3-4-4. Illinois has "constructive custody" of petitioner while he serves his Illinois sentence. Fest v. Bartee, 804 F.2d 559, 559-60 (9th Cir. 1986); see Fisher v. Carroll, 375 F. Supp. 2d 385, 395 n.14 (D. Del. 2005) ("After an interstate transfer occurs pursuant to the [Interstate Corrections Compact], the sending state remains the custodial of the inmate.").

wife stayed at the AmeriSuites Hotel. At 10:00 a.m. on January 24, petitioner asked a hotel clerk to call 911, claiming that his wife had fallen and was having trouble breathing. Paramedics arrived at the Blairs' hotel room and found Teresa lying unconscious on the floor, her head propped up by a pillow and her body wrapped in a blanket. She was transported to Condell Medical Center and never regained consciousness. She died the following day as a result of a subdural hematoma (a blood clot on the outer surface of the brain).

Occupants of hotel rooms near the Blairs' told police that shortly before the incident, they heard screaming and thumping sounds; one hotel guest, Michael Newby, testified that at 10:30 p.m. on January 23, he heard petitioner yelling at his wife for smoking in the room. Newby then opened his door and stood in the hallway, listening to the sounds of fists hitting skin for five minutes. He heard screaming and banging again at 1:00 a.m., and more banging at 3:00 a.m.

Petitioner related substantially different accounts of the events of January 23 and 24 to various witnesses who testified at trial: a paramedic who responded to the 911 call; a nurse at the Condell Medical Center; an emergency room doctor who examined petitioner's wife and spoke to him on January 24; a police officer who spoke to defendant at the hospital on January 24 in response to a call about Teresa's suspicious injuries; and the officers who interviewed petitioner from 10:15 to 10:45 that evening, after petitioner had been read his <u>Miranda</u> rights and signed a waiver at the police station. All of these divergent stories also differed from the confession petitioner eventually gave early in the morning of January 25.

After petitioner's first interview at the police station, the officers asked petitioner to complete a written statement, which he did. After a half-hour break, the officers brought

2

petitioner back to the interview room, and another 75 minutes later (around 1:30 a.m.), they told defendant that there were inconsistencies in his account and asked if he and his wife had been arguing on the night of January 23. During the ensuing interview and written statement, which petitioner completed around 4:00 a.m., petitioner confessed that after beginning to argue with his wife at around 10:00 p.m. on January 23, he "snapped in a fit of rage," during which he punched her between ten and twenty times, kicked her five times, and pushed her, causing her to hit her head on a table and lose consciousness. He also stated that some of her bruising was caused by previous physical altercations. Petitioner explained that after his "fit of rage," his wife never regained consciousness. Unsure what to do after his "fit of rage" subsided, petitioner "put her in the bed and thought it would be okay in the morning." When Teresa had not regained consciousness in the morning, petitioner dragged her to the bathroom and cleaned her up. Then he dragged her back to the bedroom, covered her, put a pillow beneath her head, and wiped her mouth. Petitioner called his father-in-law, who told him to call an ambulance.

Dr. Nancy Jones, the doctor who performed the autopsy, testified as an expert witness in forensic pathology. She testified that the victim had 46 blunt trauma injuries of various ages, that she suffered from cirrhosis of the liver and Hepatitis C, and that her brain was swollen and had a subdural hematoma as well as multiple hemorrhages. Dr. Jones further testified that she had conducted the autopsies of around one hundred individuals who died by falling, and that those individuals typically exhibited injuries ("gliding contusions" and bruising on the under surface of the scalp) that Teresa did not. Dr. Jones also stated that many of the injuries Teresa did have were inconsistent with a fall. Finally, Dr. Jones opined that Teresa had died from a

subdural hematoma caused by blunt head trauma, which could have occurred without direct impact to her head, and that her injuries were consistent with being hit by hands and feet.

Represented by the office of the state appellate defender, petitioner appealed his conviction, claiming that his trial counsel was ineffective because he had not requested the Illinois pattern jury instruction on "other crimes" evidence. Rule 23 Order, People v. Blair, No. 2-03-0101, at 12-13 (Ill. App. Ct. Aug. 6, 2004) (referring to Illinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000)). The Illinois Appellate Court affirmed. Id. at 14. The Illinois Supreme Court denied petitioner's counseled petition for leave to appeal ("PLA"), which raised the same ineffective assistance claim. People v. Blair, 824 N.E.2d 285 (unpublished table decision) (Ill. 2004).

In 2005, petitioner filed a pro se petition for postconviction relief, which he supplemented in 2008 with the assistance of counsel. This petition again alleged that petitioner's trial counsel provided ineffective assistance, but for entirely different reasons than the one petitioner advanced on direct appeal. Petitioner now cited his counsel's failure to call nine witnesses petitioner believed would have offered testimony in support of his defense theory. Petitioner relatedly argued that because his attorney had failed to present a medical expert to counter the State's expert, it was critical that he effectively cross-examine the State's medical expert, which he allegedly did not do. The trial court granted the State's motion to dismiss the petition, and the Illinois Appellate Court affirmed. See Rule 23 Order, People v. Blair, No. 2-09-0605 (Ill. App. Ct. Jan. 28, 2011). Petitioner filed a PLA, but his PLA did not raise any of the issues in the postconviction petition; instead, it raised a new argument that the medical opinions offered by two of the State's witnesses were "in error." PLA, People v. Blair, No. 112011, at 2

4

(filed Mar. 8, 2011). The Illinois Supreme Court denied this PLA. People v. Blair, 949 N.E.2d 1099 (unpublished table decision) (Ill. 2011).

While his first postconviction petition was on appeal, petitioner filed a second petition for postconviction relief, raising a "'free-standing claim of innocence' based on 'newly discovered evidence.'" The trial court dismissed the petition, noting that petitioner had not requested leave to file it. See People v. Blair, No. 2-10-0059, at 2 (Ill. App. Ct. Mar. 23, 2011). Petitioner appealed, and his appointed counsel moved to withdraw pursuant to Pennsylvania v. Finley, 481 U.S. 551 (1987). The Illinois Appellate Court granted counsel's motion and affirmed the trial court's judgment, finding that the postconviction petition was properly dismissed "because it was conclusory and otherwise meritless." Id. Respondent states, and petitioner does not contest, that no PLA was filed from that second postconviction petition.

On June 16, 2011, petitioner filed the instant petition for a writ of habeas corpus, raising six claims:

(1) his conviction was "based on an incorrect autopsy conclusion," which was a result of his confession having been coerced;

(2) the State "conceal[ed] the true cause of [the victim's] death" by cremating her body a week after the autopsy;

(3) trial counsel was ineffective, for eight reasons;[2]

(4) the State introduced false testimony from witness Mike Mewby;

---

[2] Petitioner claims that his trial counsel should have: 1) called Teresa's attending physicians; 2) requested that an independent pathologist examine Teresa's body; 3) called Javier Herrera rather than stipulating to his testimony; 4) objected to the admission of autopsy photographs; 5) called Peggy Steverson and Danny Hembree to testify; 6) introduced surveillance footage from the fitness room; 7) called petitioner to testify; and 8) moved to suppress petitioner's confession.

(5) the trial court erred in admitting autopsy photographs; and

(6) petitioner's confession was coerced.

## DISCUSSION

**I.  Petitioner's Claims**

Because petitioner failed to raise any of the claims asserted in the instant petition through one complete round of state court review, all of those claims are procedurally defaulted. 28 U.S.C. § 2254(b) (requiring exhaustion of state remedies); O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); Guest v. McCann, 474 F.3d 926, 929 (7th Cir. 2007). The only claim petitioner exhausted is the claim he raised on direct review: that his trial counsel was ineffective in failing to request a jury instruction on evidence of other crimes. Although petitioner has raised ineffective assistance of trial counsel in the instant petition, the operative facts he has now alleged are entirely distinct from the jury instruction claim he exhausted in state court, and he cannot contend to have exhausted these claims merely because he exhausted the same legal theory in state court. Byers v. Basinger, 610 F.3d 980, 985 (7th Cir. 2010) ("A petitioner must fairly present his federal claims to the state courts by arguing both the law and the facts underlying them"); Anderson v. Benik, 471 F.3d 811, 814 (7th Cir. 2006) (explaining that fair presentment requires a petitioner to present the same "factual and legal substance" to the state courts as raised in his federal habeas petition).

Because his first PLA did not repeat any of the claims raised in the petition before the Illinois Appellate Court, petitioner did not exhaust any claims raised in his first postconviction petition. And petitioner's second postconviction petition (which did not raise any of the issues

6

in the instant petition) did not exhaust any claims, because petitioner did not file a second PLA.

When claims are procedurally defaulted, they cannot be raised on federal habeas review "unless the petitioner can demonstrate both cause and prejudice from the default or that a miscarriage of justice will occur" if the court does not consider the claims. Woods v. Schwartz, 589 F.3d 368, 373 (7th Cir. 2009). To demonstrate cause, a petitioner must show that an "objective factor external to the defense"—such as constitutionally ineffective assistance of counsel—"impeded counsel's efforts to comply with the State's procedural rule." Guest, 474 F.3d at 929 (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)). Petitioner has contended that the ineffective assistance of his direct appeal counsel prevented him from appealing on the basis of his trial counsel's alleged ineffectiveness.

But petitioner could also have raised ineffective assistance of trial counsel in his postconviction proceedings, where he does not claim he received ineffective assistance. Indeed, he did raise ineffective assistance of trial counsel—on some of the operative facts alleged in the instant petition—in his first postconviction petition, only to abandon those claims in the ensuing PLA. He has not attempted to demonstrate cause for his failure to exhaust on collateral review the issue of his trial counsel's ineffectiveness. Petitioner does not claim that he received ineffective assistance at any of his collateral proceedings, and regardless it is unlikely that such a claim could constitute cause for his failure to exhaust the instant claims of ineffective assistance of trial counsel. See Coleman v. Thompson, 501 U.S. 722, 753-74 (holding that ineffective assistance at a postconviction proceeding does not qualify as cause for a default); cf. Martinez v. Ryan, __ S.Ct. __, No. 10-1001, 2012 WL 912950, at *1 (Mar. 20, 2012) (holding that

7

"[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance of trial," but only where—as is not the case here—a petitioner's first opportunity to claim ineffective assistance of trial counsel was on collateral review).

Nor has petitioner demonstrated that a miscarriage of justice will occur if the court cannot consider his claims on the merits. This relief is limited to situations where the constitutional violation has probably resulted in a conviction of one who is actually innocent. Dellinger v. Bowen, 301 F.3d 758, 767 (7th Cir. 2002); see Murray, 477 U.S. at 496. This standard requires a petitioner to "show that in light of new evidence, it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." Coleman v. Hardy, 628 F.3d 314, 318 (7th Cir. 2010) (internal quotation and citation omitted). The petitioner must offer "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Schlup v. Delo, 513 U.S. 298, 324 (1995). The court then assesses this evidence along with "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial," and determines whether the petitioner's new evidence makes it more likely than not that no reasonable juror would have found him guilty. House v. Bell, 547 U.S. 518, 538 (2006). But the evidence petitioner has attached to his habeas petition and to his reply letter (titled "Amended/Petition," Dkt. 14) does not meet that standard; only some of it is new, and the evidence that is new does not cast doubt on the "overwhelming evidence, both direct and circumstantial, of [petitioner's] guilt." Rule 23 Order, People v. Blair, No. 2-03-0101, at 14 (Ill. App. Ct. Aug. 6, 2004).

8

The majority of the exhibits petitioner offers as proof of his innocence are not new—they are police and doctors' official reports made around the time of the incident, well before trial. Even if petitioner did not have access to these reports before trial (which he does not allege), these reports actually support—or are at least consistent with—the prosecution's trial theory and petitioner's guilt. For example, petitioner provides a police report that describes an interview with one of the emergency room doctors who treated Teresa and observed that her teeth were loose, that there was blood around her mouth and at the base of her teeth, and that she had suffered a subdural hematoma on the outside of the brain. Petitioner also offers consulting physicians' reports, which confirm that the victim suffered a massive subdural hematoma and exhibited a number of bruises on various parts of her body. Although one report notes that Teresa's parents told a doctor that she had suffered from "multiple injuries in the past that had been attributed to falls," the fact that her parents believed her injuries resulted from falls is not necessarily inconsistent with the evidence at trial that those previous injuries were <u>in fact</u> the result of physical altercations with petitioner.

Several other police reports fall into this category: one showing that petitioner attended the seminar in Vernon Hills every day from January 17 through January 23, 2001; one detailing an interview with an AmeriSuites Hotel employee who had several encounters with Teresa, including helping her to use the fitness center's treadmill around 12:30 p.m. on January 23; one indicating that, after checking with five police departments, an investigator located no reports of domestic violence between petitioner and his wife (though he did find a record of a 1990 arrest of Teresa for theft under $20); and one showing that the police had recovered video surveillance footage from the AmeriSuites hotel. The prosecution did not claim petitioner had not attended

9

his seminar through its conclusion on January 23. Nor did the prosecution's theory rely on whether Teresa used the treadmill. Even if petitioner had evidence that she had fallen on the treadmill, significant evidence at trial still would have shown that the wound that killed her was inconsistent with an injury from falling. Further, the prosecution did not claim that petitioner and his wife had a history of domestic violence, and the absence of a previous record does not show that petitioner was innocent of murdering his wife. Finally, petitioner does not explain the relevance of the surveillance footage other than to say that the tapes pertain "to the accident on the treadmill." But, as discussed above, whether Teresa had a treadmill accident was not relevant to the prosecution's theory, and it would not likely have changed the jury's evaluation of the evidence against petitioner.

Petitioner also points to a portion of the trial transcript indicating that the State's medical expert, Dr. Jones, testified on cross-examination that the victim's "head did not necessarily have to strike anything" and "a quick movement" "could have" caused her subdural hematoma. This is not new evidence, and regardless it does not contradict the State's theory that the hematoma was caused by blunt trauma as a result of petitioner's having beaten her. Petitioner argues that this testimony shows that his confession was coerced, because his confession "does not match" the testimony. In his written confession, petitioner wrote: "I am not sure exactly how many times I struck her, but I know that I punched her more than 10 times and less than 20. I kicked her with my right foot 5 times, and during this I pushed her[,] and she hit her head on the table with the lamp. . . . Teresa never regained consciousness after I did this . . . ." Rule 23 Order, People v. Blair, No. 2-03-0101, at 10 (Ill. App. Ct. Aug. 6, 2004) (quoting petitioner's written statement). Petitioner's statement did not indicate, as petitioner could not possibly have known,

10

precisely <u>which</u> blow, if any particular blow, caused the subdural hematoma. The State did not attribute her death to a particular blow either, instead arguing generally that she died from blunt trauma. On direct examination Dr. Jones testified that "one of the things about the brain is that you can have blunt impact to the structures inside the head without actually hitting the head itself," and that this can result from "throwing somebody to the ground where they never actually hit their head on anything," though blunt trauma can also result when "the head has impacted with something." Thus, it was not inconsistent with petitioner's confession for the State's expert to testify that the injury could have occurred without her head striking something.

In addition, petitioner provides an unsigned 2004 letter on "Hepatitis C Awareness Project" letterhead suggesting that the author, who is not a doctor, believes that the medical reports petitioner sent him or her indicate that the victim suffered from cirrhosis. But at trial, petitioner's counsel offered testimony that Teresa had cirrhosis of the liver as a result of a drinking problem, so it is unclear how this letter could constitute "new" evidence that might compel a reasonable juror to reach a different conclusion.

Petitioner also points to Michael Newby's written statement, which does not mention that he heard the sound of fists hitting skin, as he testified at trial. But nothing in Newby's written statement was inconsistent with his trial testimony, and the fact that his trial testimony was more elaborate than a written statement provided on the evening of January 24 does not indicate that petitioner is innocent. Petitioner also states that at the time of trial, there was an outstanding warrant for Newby's arrest, but he does not present any evidence of that or indicate how it would have affected the jury's evaluation of Newby's credibility.

The rest of petitioner's exhibits, although they arguably support the defense theory petitioner believes his trial counsel did not sufficiently pursue, do not constitute "new reliable evidence" that petitioner is actually innocent. Schlup, 513 U.S. at 324. First, the 2007 declaration of Dr. Harry Bonnell (a forensic pathology expert) indeed disputes the State's medical expert testimony, claiming that it "was inaccurate, incomplete, and inadequately questioned by the defense." But the presence of dueling experts would rarely, if ever, make it impossible for a reasonable jury to convict a defendant. See Smith v. McKee, 598 F.3d 374, 388 (7th Cir. 2010) (holding that statements of two witnesses not called at trial did not "sufficiently counter" the prosecution's evidence, which included two eyewitness identifications and the petitioner's inculpatory statement); Hayes v. Battaglia, 403 F.3d 935, 937 (7th Cir. 2005) (holding that, when the prosecution had offered six inculpatory witnesses, the petitioner could not satisfy the Schlup standard by offering six exculpatory witnesses).

In any event, Dr. Bonnell attacks only specific portions of Dr. Jones's testimony, not her overarching claim that Teresa died from blunt trauma to the head, which could have been caused by any one of a number of events (being "cuffed" in the head, thrown to the ground, thrown against a wall, or shaken). And it is far from certain that a jury would credit Dr. Bonnell—whose declaration was obtained six years after the trial and was based entirely on his review of the trial transcript and reports available at the time of trial—over Dr. Jones, who personally performed Teresa's autopsy. In light of the other evidence at trial, including petitioner's confession, the court cannot conclude that Dr. Bonnell's disagreement with the State's expert testimony (and trial counsel's cross-examination) would likely have prevented the jury from reaching a different verdict.

Petitioner next contrasts the obituary of his wife (stating that she was cremated on January 30, 2001) with her death certificate (indicating that the cremation occurred on February 2). Although these dates are indeed inconsistent, the fact that the date was wrong in one of these sources does not imply that petitioner was innocent.

Petitioner also offers the affidavit of a doctor who had been treating Teresa for depression in the two years preceding her death, and had been prescribing her Celexa and Diazepam before her death. Petitioner's purpose in offering this affidavit is ostensibly to show that petitioner "was crying and seemed distraught over his wife, Teresa, being in the hospital" when he called the doctor at 1:30 p.m. on January 24, 2001. But the fact that petitioner was very upset on the day his wife died does not demonstrate his innocence.

Petitioner provides the affidavit of Peggy Steverson (Bratton), a longtime friend of petitioner and his wife who states that petitioner never battered his wife and that she and her ex-husband wanted to testify for the defense at trial but were turned down by petitioner's counsel. Petitioner also offers the affidavit of Danny Hembree, another longtime friend who provides a list of questions regarding the trial evidence that he believes supports a finding that petitioner's trial counsel was ineffective. These individuals have no personal knowledge of the events surrounding Teresa's death, and do nothing to contradict the substantial evidence pointing to petitioner's guilt, including the medical evidence, the witness testimony, and petitioner's own confession.

Although petitioner now claims, for the first time, that his confession was coerced, petitioner has not provided any "plausible excuse for [this] most damaging piece of evidence." Herrera v. Collins, 506 U.S. 390, 424 (1993) (O'Connor, J., concurring). In light of that

evidence as well as the other, substantial evidence against him, petitioner has not demonstrated that it is "more likely than not [that] any reasonable juror would have reasonable doubt" about his innocence, even considering the new evidence petitioner has offered. House, 547 U.S. at 538; see Morales v. Johnson, 659 F.3d 588, 606 (7th Cir. 2011). Petitioner has therefore failed to satisfy the standard that would allow the court to consider his claims on their merits. See House, 547 U.S. at 537.

## II. Certificate of Appealability

A habeas petitioner is entitled to a certificate of appealability only if he has made a substantial showing that he was denied a constitutional right. 28 U.S.C. § 2253(c)(2); see Miller-El v. Cockrell, 537 U.S. 322, 336 (2003); Evans v. Circuit Court of Cook County, Ill., 569 F.3d 665, 667 (7th Cir. 2009). To make that showing, a petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000). When the court has denied a habeas petition on procedural grounds without reaching the petition's underlying constitutional claims, as is the case here, a petitioner must also show that jurists could debate whether the court's procedural ruling was correct. Id. at 484-85. But (as explained above) petitioner's claims are procedurally defaulted because petitioner did not raise any of them through a complete round of state court review, and that failure is not excused by cause and prejudice or by a showing of actual innocence. Reasonable jurists could not find otherwise. The court therefore declines to issue a certificate of appealability on any of petitioner's claims.

## CONCLUSION

For the reasons discussed above, the petition for a writ of habeas corpus is denied. The court declines to issue a certificate of appealability.

**ENTER:** April 11, 2012

**Robert W. Gettleman**
**United States District Judge**